## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JEFF MACON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-2327-JAR |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

In Kansas, employers are subject to suit for retaliatory discharge when an employee is terminated for exercising his rights under the Workers Compensation Act.  Jeff Macon was injured while employed by United Parcel Service, Inc. ("UPS"), filed a workers compensation claim, and was terminated after returning to work.  Because the pattern of retaliation asserted by Macon does not connect his filing for workers compensation benefits to UPS's termination of him in November 2009, Macon has not raised a genuine issue of material fact as to the causal connection factor, nor can he show pretext.  UPS's motion for summary judgment (Doc. 59) is granted.

## I.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]   A fact is "material" if under the substantive law it is essential to the proper disposition of the

---

[1] Fed. R. Civ. P. 56; *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011).

claim.[2]  "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[3]  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[4]  The burden of showing that no genuine issue of material fact exists is borne by the moving party.[5]  Once the moving party meets the burden, the nonmoving party must demonstrate a genuine issue for trial on a material matter.[6]

## II.    Facts

For the purposes of the UPS's Motion for Summary Judgment, the following facts are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to Macon.

Jeff Macon began working part-time for UPS on April 2, 2001 as a preloader.  Macon was expected to abide by the Honesty in Employment policy, which obligated him to maintain personal honesty while employed by UPS.  Macon was aware that violation of the policy would result in immediate dismissal.  In 2004, Macon began working full time as a package car driver in UPS's North Center in Lenexa, Kansas.  He did not receive the typical training most UPS drivers received due to his work experience with the company.

Macon's employment with UPS was subject to the National Master Union Parcel Service

---

[2]*Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).

[3]*Adler*, 144 F.3d at 670.

[4]*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[5]*EEOC v. Horizon /CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

[6]*Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

Agreement and Central Region Supplement (the "collective bargaining agreement" or "CBA") between UPS and the International Brotherhood of Teamsters ("Teamsters"). Local Union 41 of the Teamsters ("Local 41") represents the drivers in the Lenexa North Center where Macon was employed with UPS. Macon was a member of Local 41. The Union Stewards for Lenexa North package car drivers while Macon was employed by UPS, with regard to disciplinary actions taken against the employees, were Mark Von Elling and Jeff Dossett.

Article 5 of the CBA, Central Region Supplement, sets out the grievance procedure covered employees are required to use to challenge any conduct on the part of UPS that they believe is in violation of the CBA. Article 5 provides that upon notification of discipline issued to the employee by the employer, the employee may choose to submit a grievance protesting the discipline. Once an employee submits a grievance, a local hearing is held regarding the grievance between UPS and the Union Local. If the grievance is not resolved at the local hearing, the grievance is then presented to the UPS Joint Area Committee, commonly called the Mo/Kan panel. The Mo/Kan panel consists of an equal number of representatives from the Union Local and UPS. The panel is comprised differently depending on which local union is involved and in which state the UPS facility is located. If the UPS facility is in Kansas, the management representatives are from Missouri or Nebraska, and *vice versa*. Similarly, the union representatives on the panel are members of a Teamsters local different from that of the grievant. Under Article 17, an employee subject to the CBA may be immediately terminated without progressive discipline for certain offenses, including dishonesty, and for offenses mutually-agreed upon by UPS and the Union pursuant to the Other Serious Offenses section of Article 17.

UPS management personnel and UPS safety committee members perform on-area

observations of UPS package car drivers.  The observer performs an on-area observations by driving through UPS delivery route areas, and upon encountering a UPS driver, the observer will evaluate whether the UPS driver is complying with UPS delivery and safety procedures.  All discipline for employees is recorded on a Form 1000.

The management structure at the Lenexa North Center consists of on-road supervisors, business managers and a division manager.  The package car drivers report to the on-road supervisors, who report to the business managers, who report to the division managers.  At the Lenexa facility, there were four business managers (also known as center managers) who reported to the division manager: the business manager of the Lenexa North package center, the business manager of the Lenexa West package center, the business manager of the Lenexa East package center, and the business manager assigned to the Preload.

Macon had a number of supervisors while employed at UPS.  Macon's on-car supervisor was Chris Doolittle from 2005 until the later part of 2008.  From the end of 2008 until November 2009, Macon reported to on-car supervisor Kelly Ceesay.  From August 2006 until sometime in March 2009, the Center Manager in Lenexa North Center, where Macon was assigned, was Hamilton Terrell.  From March 2009 until November 2009, the Center Manager in Lenexa North Center was Kevin Stark.  Between 2007 and April 2010, the Division Manager at UPS's Lenexa facility was Gary Allen.

UPS has established delivery procedures for the drivers, including stop recording procedures.  When package car drivers have multiple packages for delivery to the same building or business location but do not attempt to deliver each package to different locations within the building or business and the packages are left at one location like a mail room or a central

receiving location, the driver may only take credit for one stop.  Changes regarding how UPS expected its package car drivers to record UPS deliveries are communicated through pre-communication meetings (PCM), which take place before a driver left the facility for the route. Changes could also be communicated by word of mouth or by documentation presented to each driver.  PCMs are conducted by UPS managers, supervisors, or Union Stewards to provide direction to package car drivers regarding UPS policies and procedures.

As a package car driver, Macon picked up and delivered packages to UPS customers along a route that he chose through a bidding process pursuant to the CBA.  Macon carried an electronic device, known as a DIAD, in which he input certain data that included recording his lunch break, scanning and recording packages, and recording delivery stops.  A package car driver's "planned day" is determined, in part, by the number of stops the package car driver records in the DIAD.  Package car drivers assigned to the Lenexa North Center are paid for the hours in their "planned day" or for the hours the driver actually works, whichever is longer.  If a driver recorded more stops in his DIAD then UPS policy permitted him to take, this would essentially "inflate" his planned day, and if the package car driver completed all of his deliveries in less time than his planned day, he would receive bonus compensation, which consisted of the difference between the hours he actually worked and his planned day.

On or about March 5, 2007, Macon reported to UPS that he had sustained a work-related injury to his right elbow.  Macon reported that on February 12, 2007, he felt a "pop" in his right elbow when he lifted a three pound package while working.  Macon received physical therapy in connection with this injury, but did not miss any work.  He was placed on restrictive duty on March 5, 2007, and was provided temporary alternative work by UPS for March 6, 2007,

through March 9, 2007.  Macon was returned to work with no restrictions on March 12, 2007.

On April 29, 2008, UPS received an email from a customer complaining about an air package delivery for which she did not sign.  UPS investigated the complaint and determined that Macon had falsified his delivery records.  UPS terminated Macon effective April 30, 2008 pursuant to Article 17(a) dishonesty and 17(i) other serious offenses of the CBA.  On April 30, 2008, Macon submitted a grievance contesting his termination and requesting to be reinstated.

A local hearing was held in connection with Macon's grievance on May 8, 2008.  Macon was represented at the hearing by Union representatives.  UPS was represented at the hearing by Labor Manager Don Lewick.  Others participating in the hearing included: Macon, Hamilton Terrell, Gary Allen, Leland Cox, Mark Von Elling, and Jeff Dossett.

Macon's delivery records for April 28, 2008, and April 29, 2008, were reviewed.  In his deposition, Macon testified that he does not recall exactly what was discussed, only that he was "brow beaten" by Allen and Terrell.[7]  Lewick testified that Macon's delivery records were reviewed, without specifying if they were the entire delivery records or just the next day air delivery records.[8]  Terrell testified that the delivery records that were reviewed were not only the next day air records, but all the records.  Terrell stated that the individuals at the hearing were also looking at multiple package deliveries to a central location, and it was explained to Macon how to properly record multiple package deliveries.[9]  Von Elling also testified in his deposition that the delivery records of Macon were reviewed, including records of multiple package

---

[7] Def. Ex. 1, Macon Depo., at 184–88.

[8] Def. Ex. 7, Lewick Depo., at 45.

[9] Def. Ex. 4, Terrell Depo., at 117–22.

deliveries and recording procedures.[10]  Lewick states that he informed Macon that he was improperly recording his delivery stops at a number of different addresses, and he was informed how to record the stops correctly.[11]  Although Macon recalled a conversation with Lewick, he did not recall exactly what was discussed.  Terrell, Lewick, and Von Elling all testified that Macon stated at the hearing that he understood that he was recording his stops wrong and would stop recording incorrectly.[12]

Macon submitted an affidavit with his Response stating that he did not have any discussion with Lewick regarding how to record stops at a central receiving location.  Macon also states that Dossett did not make any statements about improperly recording stops, nor did Dossett and Von Elling ever tell him to properly record his stops.[13]

Macon admitted at the hearing that he falsified his records on April 28, 2008, in relation to the next day air package delivery, and the parties agreed Macon's termination would be reduced to a suspension.  Macon returned to work on May 9, 2008.  Macon does not believe that any action taken against him by UPS between February 12, 2007, and May 21, 2008, was motivated by his exercise of workers' compensation rights.[14]

On May 27, 2008, Macon reported that he sustained a work-related injury to his right elbow on May 21, 2008.  Macon was treated by a doctor and participated in physical therapy.

---

[10]Def. Ex. 9, Von Elling Depo., at 33–40.

[11]Def. Ex. 7, Lewick Depo., at 70, 95, 140.

[12]Def. Ex. 9, Von Elling Depo., at 39–44; Def. Ex. 4, Terrell Depo., at 12; Def. Ex. 7, Lewick Depo., at 139–40.

[13]Aff. of Macon, Doc. 64.

[14]Def. Ex. 1, Macon Depo., at 365.

While in therapy, Macon continued to work as a package car driver for UPS.  On August 21, 2008, Macon underwent surgery for the injury to his right elbow.  Macon was unable to work from August 21, 2008, through December 4, 2008.  On December 4, 2008, Macon returned to work without restrictions.

On February 2, 2009, On-Car Supervisor Ceesay conducted an on-area observation of Macon in which she calculated Macon as being 71% safe based on her observations.  Two days later, Ceesay conducted a Safety Ride with Macon.  Two days following, on February 6, 2009, Macon received a verbal warning for failure to record a lunch break.  Four days later Macon was issued a warning letter after failing to answer safety questions 100% correctly.  The next day, Macon was issued a warning letter for failing to record a 30 minute lunch break in his DIAD on February 10, 2009.  On February 17, 2009 Ceesay conducted an on-area observation in which she calculated Macon as being 70% safe based on her observations.  Then on February 19, 2009 Macon was issued a warning letter for not recording a lunch break.

On March 6, 2009, Macon was terminated after he was observed driving without a seatbelt and leaving a package unattended in the vehicle.  On March 10, 2009, Macon submitted a grievance stating that he was "unjustly terminated."[15]  On March 12, 2009, an Official Notice of Termination letter was issued by UPS Division Manager Gary Allen to Macon in connection with the termination on March 6, 2009.  On March 13, 2009, a local hearing was held regarding Macon's March 6 termination.  The termination was reduced to a suspension.  On that same day, Macon's workers' compensation claim was settled, and Macon accepted the amount on March 16, 2009.  On March 23, 2009 Macon was issued an Official Notice of Suspension letter from

---

[15]Pl. Ex. 24, Grievance Form; Pl. Ex. 39, Grievance Form; Pl. Ex. 2, Macon Depo., at 222.

UPS Division Manager Gary Allen indicating that Macon's termination was reduced to a suspension. Macon returned to work on March 24, 2009.

On March 24, 2009, Macon was accused of a safety violation for not wearing his seatbelt. A warning letter was issued on March 30, 2009. Macon denied that he was not wearing his seatbelt. On that same day, Ceesay claims that she observed Macon not using three points of contact and issued Macon a warning letter. Two days later, Macon was cited for not taking a lunch break. On April 6, 2009, Macon was issued a pending suspension for failing to return a pre-trip audit card to his supervisor before leaving on his route on April 3, 2009. Ceesay did not provide the pending suspension letter to Macon until April 14, 2009. On April 29, 2009, Ceesay conducted an on-area observation of Macon in which she calculated Macon as being 87% safe based on her observation. Ceesay noted that Macon did a "nice job w/ backing" and "must use flashers use signal pulling from curb."[16]

Three months later, on July 20, 2009, Ceesay conducted an on-area observation of Macon in which she rated Macon as 56% safe, although she admitted in her deposition that she made a calculation error and Macon should have been rated 69.5% safe. Ceesay observed Macon failing to use three points of contact. Ceesay issued a pending termination letter to Macon. The next day, Macon was observed not completing his DVIR book and was issued an Official Notice of Pending Termination letter. Two days later, Macon submitted a grievance form requesting the terminations received the two prior days be removed. On July 27, 2009, Macon telephoned UPS's Compliance Hotline and complained that he was being singled out and treated unfairly by Gary Allen. Two days later, Macon submitted a grievance requesting that UPS "stop the

---

[16]Pretrial Order, Doc. 58, Stipulation 43.

harassment."[17]

In the Summer of 2009, Ceesay was reviewing the ODSE system and observed that there were several drivers who were recording "left ats" at addresses on the College Boulevard routes. Ceesay testified that she informed her drivers they could not take credit for stops they were not actually making.  Macon denies he was ever told he could not take credit for multiple stops when delivering multiple packages to a central receiving location.

On September 21, 2009, Ceesay conducted an on-area observation of Macon in which she calculated Macon as being 93% safe based on her observation.

On October 30, 2009, and November 2, 2009, Ceesay reviewed the UPS OSDE system and saw that Macon's delivery records showed several "left ats" recordings that indicated to her that Macon may be improperly taking credit for multiple stops at addresses that she knew were central receiving locations.  Ceesay was familiar with Macon's route because it was a training route on which she conducted new driver training.  On November 3, 2009,  Gary Allen issued Macon an Official Notice of Termination letter advising that his employment was terminated effective November 3, 2009, pursuant to Article 17(a) dishonesty and (i) other serious offenses. The stated reason was for "falsification of records."[18]  On November 4, 2009, Macon submitted a grievance form protesting his termination.  Macon's grievance was heard by the Mo/Kan panel on November 19, 2009.  The panel upheld Macon's termination.  At the hearing, Macon stated that he did not understand that he was improperly recording the stops he made on October 30,

---

[17]Pretrial Order, Doc. 58, Stipulation 45; Pl. Ex. 46, Grievance Form.

[18]Pretrial Order, Doc. 58, Stipulation 47; Def. Ex. 15, Company Presentation Rs.; Pl. Ex. 34, Employee Record.

2009, and November 2, 2009.[19]

## III.    Discussion

Kansas recognizes an employment discrimination claim when an employee is terminated in retaliation for the exercise of his workers' compensation claim.[20]  The *McDonnell Douglas* burden shifting analysis applies to Kansas employment actions.[21]  Under this analysis, the burden is on the employee to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice, which is ordinarily shown by setting forth a prima facie case.[22]  Once plaintiff has met this burden, the employer must come forward with evidence that the employee was discharged for a legitimate, nondiscriminatory reason.[23]  If the employer sets forth this evidence, the employee must come forward with evidence that the reasons were merely a pretext for discrimination.[24]

The elements of a prima facie claim for retaliatory discharge for filing a workers compensation claim are: (1) the plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected

---

[19]Def. Ex. 1, Macon Depo., at 268.

[20]*Murphy v. City of Topeka*, 6 Kan. App. 2d 488,497, 630 P.2d 186 (1981).

[21]*Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 552, 35 P.3d 892 (2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[22]*Rebarchek*, 272 Kan. at 553.

[23]*Id.*

[24]*Id.*

activity or injury and the termination.[25]

There is no dispute that the first three elements of a prima facie case are present here. Macon was injured at work, UPS was aware of Macon's injury, and UPS terminated Macon. The only element in dispute is whether there is a causal connection between the workers compensation claim and the termination.  To establish the requisite causal connection, the burden is on the plaintiff to prove an unlawful intent on the part of the employer to terminate him because he had filed a workers' compensation claim or had sustained a work-related injury for which he might file such a claim.[26]  A causal connection is typically shown by circumstantial evidence showing a close temporal proximity between the claim and the discharge.[27]  But proximity alone is not enough to prove a causal connection.[28]  Although a month and a half is sufficient to show a causal connection, courts have found a period of three months or more too remote, and required additional evidence.[29]

Proximity in time between the claim and discharge is a typical beginning point for proof of a causal connection.[30]  Neither party refers to the date the workers compensation claim was filed, but a review of Macon's exhibits shows that the Workers Compensation Claim states the

---

[25]*White v. Tomasic*, 31 Kan. App. 2d 597, 601–02, 69 P.3d 208 (2003).

[26]*Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

[27]*White*, 31 Kan. App. 2d at 602.

[28]*Sutherland v. Goodyear Tire & Rubber Co.*, 446 F. Supp. 2d 1203, 1214 (D. Kan. 2006).

[29]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002) (explaining that three months between protected activity and adverse employment action requires additional evidence); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (stating that a three month period alone is insufficient).

[30]*Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 555, 35 P.3d 892 (2001).

injury was reported on May 27, 2008.[31]   After filing the claim, Macon continued to work during

June, July, and August 2008.  But Macon does not allege any retaliatory conduct on the part of

UPS during this time period.  Because there is no alleged  pattern of retaliatory conduct in the

three months following the filing of the claim, Macon has not raised a genuine issue of material

fact whether a causal connection exists between the two events.  In fact, UPS did not discharge

Macon until November 3, 2009.  The period of fifteen months between the filing of the claim

and the discharge does not demonstrate close temporal proximity.  This gap of time is

insufficient to establish causation connection without additional evidence.

Close proximity between the date of filing and the date of termination, however, is not

the sole means of showing a causal connection.[32]  "Close temporal proximity" to support a

retaliation claim "must not be read too restrictively when the pattern of retaliatory conduct

begins soon after the filing of a complaint and culminates in discharge."[33]  Indeed, a plaintiff can

avoid summary judgment by showing a pattern of retaliatory conduct leading up to termination.[34]

The Kansas Supreme Court, in *Rebarchek v. Farmers Co-op. Elevator*, allowed a plaintiff to

prove causal connection by showing a pattern of retaliatory conduct, but the Court noted that the

passage of five months between the date of filing and the date of termination "probably

approaches the limit that would be recognized as part of a pattern for the purpose of establishing

---

[31]*See* Pl. Ex. 35.

[32]*Rebarchek*, 272 Kan. at 555.

[33]*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (addressing retaliation claim under the Fair Labor Standards Act).

[34]*Rebarchek*, 272 Kan. at 555.

a causal connection between the protected activity and termination."[35]  So even taking into account Macon's claim of a pattern of retaliatory conduct, the fifteen month delay between Macon's filing and his discharge is well beyond the limit contemplated in *Rebarchek*.  Even noting that Macon was not working during the months of September, October, and November 2008, Macon still cannot establish a connection between the filing of the claim and his termination.  Macon returned to work on December 4, 2008.  There is a two month time period between December and February in which Macon was working, but he does not allege any conduct on the part of UPS which would constitute an adverse employment action or a pattern of retaliatory conduct.  Before February 6, 2009, Macon had a five month period of work following his injury and the filing of the workers compensation claim without any alleged retaliatory conduct by UPS.  The first adverse employment action alleged by Macon was in March 2009, ten months after filing the claim.  Macon returned to work on December 4, 2008, and a time period of three months elapsed between his return to work and an alleged adverse employment action.  Thus, even considering the pattern of retaliatory conduct Macon has not shown a causal connection between the filing of the complaint and the termination.

Macon, however, argues that the filing of the claim is not the only protected activity that can be used to determine causal connection.  He refers instead to the settlement dates of March 13 and March 16, 2009, in attempting to establish a casual connection.  The Tenth Circuit has noted that the Kansas courts have not "addressed whether an employee's ongoing participation in litigation constitutes protected activity, instead noting only that the filing of a claim is

---

[35]*Id.* at 556.

protected activity."[36]  In *Rebarchek*, the Kansas Supreme Court established that the time period used to determine a causal connection was the time between the filing of the complaint or the injury and the termination.[37]  The plaintiff in *Rebarchek*, like Macon, had left work because of his work related injury.  The court in *Rebarchek*, however, considered only the time of the filing of the complaint as the protected activity and not any other time that the defendant exercised his rights under that workers compensation act.  Macon attempts to circumvent *Rebarchek* by relying on *Acosta v. National Beef Packing Co.* in support of his argument that he participated in protected activity until his settlement in March 2009.[38]  *Acosta*, however, only addressed the ability of a district court to enforce a workers compensation award in a civil proceeding and not how to determine whether a plaintiff has proved a causal connection between a protected activity and termination for purposes of a retaliation claim.[39]  *Acosta* relied on *Jones v. Continental Can Co.*,[40] a case dealing with the Workers Compensation Act.  In *Jones*, the Court ruled the Act was complete and provided for all phases of the right to compensation and the procedure for obtaining it, and the civil rules and procedures did not apply.[41]  But *Jones* said nothing about a retaliation claim or causal connection.  Clearly, Macon's reliance on *Acosta* is not applicable.

     Without a Kansas case that directs this Court to find that the settlement of a workers

---

[36]*Proctor v. United Parcel Service*, 502 F.3d 1200, 1212 (10th Cir. 2007) (citing *Rebarchek*, 35 P.3d at 899).

[37]*Id.* at 554.

[38]*Acosta v. Nat'l Beef Packing Co.*, 273 Kan. 385, 44 P.3d 330 (2002).

[39]*Id.* at 341.

[40]260 Kan. 547, 920 P.2d 939 (1996).

[41]*Jones v. Cont'l Can Co.*, 260 Kan. 547, 557, 920 P.2d 939 (1996).

compensation claim is protected activity, Macon cannot rely on the March settlement date in the causal connection analysis.  Instead, the Court will follow the direction of *Rebarchek* and use the filing of the complaint as the protected activity to measure causal connection.  As discussed above, Plaintiff has failed to establish a genuine issue of fact as to the causal connection between reporting the injury on May 27, 2008, and termination on November 3, 2009.

Still, even if the Court considered the date of the settlement as the protected activity, there is a seven-month delay between the settlement in March 2009, and the termination in November 2009.  And for the three-month period between July 2009, and November 2009, Plaintiff alleged no actions on the part of UPS which would constitute adverse employment action, or support a showing of a pattern of retaliatory conduct.  This is beyond the time frame that the Kansas Supreme Court in *Rebarchek* contemplated as the limit for establishing a causal connection between the protected activity and termination.  Thus, under either calculation, Plaintiff has not shown the last element in his prima facie case.

Even if the Court found a prima facie case of retaliatory discharge, UPS has set forth a legitimate reason for Macon's termination.  UPS states that Macon was terminated due to work performance and failure to follow delivery rules.  Specifically, Macon was terminated for incorrectly recording his deliveries, which allowed him to pad his day, and ultimately, his pay.  This constituted dishonesty under UPS policies.  UPS need only assert an articulate reason for termination and it has done so.[42]

If the employer articulates a legitimate, non-retaliatory reason for termination, "the employee must assert specific facts establishing a triable issue as to whether the employer's

---

[42]*Rebarchek*, 28 Kan. App. 2d at 111.

reason for discharge is a mere cover-up or pretext for retaliatory discharge."[43]  If there are no

material facts relating to pretext in dispute, then summary judgment is appropriate.[44]  To show

that the stated reasons for termination are pretextual, Macon must demonstrate "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered

reasons "that a reasonable fact finder could rationally find them unworthy of credence."[45]  A

plaintiff typically shows pretext in one of three ways: (1) with evidence that defendant's stated

reason for the termination was false, (2) with evidence that defendant acted contrary to a written

company policy prescribing the action to be taken under the circumstances, or (3) with evidence

that defendant acted contrary to an unwritten policy or contrary to company practice when

making the adverse employment decision.[46]  Pretext may also be shown by differential treatment

of similarly situated employees.[47]  Similarly situated employees are those who deal with the

same supervisor and are subject to the same standards governing performance evaluation and

discipline.[48]  To establish a genuine issue as to pretext, Macon must demonstrate that UPS's

proffered non-discriminatory reason is unworthy of belief.[49]

Macon first attempts to show pretext by showing he was treated differently than other

UPS employees.  Macon argues that evidence of retaliation and pretext is shown by Tim Kelly, a

---

[43]*Bracken v. Dixon Indus., Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679 (2002) (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)).

[44]*Id.* at 1276.

[45]*Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1136 (10th Cir. 2005).

[46]*Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[47]*Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 922 (10th Cir. 2004).

[48]*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[49]*Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008).

17

driver for UPS who was not terminated or disciplined for the same infractions as Macon.  A review of Tim Kelly's deposition shows that he was not accused of incorrectly recording his stops.  Kelly testified that he "ran residential routes forever" and did not recall how he was trained on commercial deliveries.[50]  Macon's general conclusory allegation is not supported by Kelly's deposition.  And Macon does not cite to specific exhibits in the record that would allow the Court to compare Kelly's employee record and Macon's employee record.

Macon also argues that other drivers who did not file workers compensation claims were disciplined differently for the same infractions, including Steve Cowart and Jeff Dossett.  But Macon does not support this statement with any specific evidence in the record.  Without citing to evidence in the record, Macon cannot show the drivers were disciplined differently for incorrectly recording their stops, the reason he was terminated.

Macon next tries to show that UPS's stated reasons for termination are false.  The inquiry for the Court is whether UPS terminated Macon under a reasonable belief that he violated the rules and policy of UPS.  UPS stated Macon was terminated for dishonesty in improperly recording his stops.  In his deposition, Macon admits that he was not recording his deliveries correctly, although at the time he worked for UPS, he did not know he was doing it incorrectly.  Macon argues that UPS knew that he was never trained on how to record stops correctly.  But this argument does not show that UPS's stated reason for termination was pretextual.  "An employer's exercise of erroneous or even illogical business judgment does not constitute pretext."[51]  If UPS erroneously believed that Macon was properly trained, either when he became

---

[50]Pl. Ex. 17, Kelly Depo., at 18.

[51]*Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995).

a package car driver or after he appealed his termination in 2008, then he was terminated under a reasonable belief. The question when looking at pretext is not "whether the employer's proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."[52] The Court should not second guess the employer's business judgment, even if at the time it was erroneous.[53]

In Macon's last argument, he again points to a pattern of retaliatory conduct on the part of UPS to demonstrate pretext. But the eighteen-month period between the May 2008 claim and the November 2009 termination fails to support a finding of retaliatory motive. The timing of UPS's attempted terminations of Macon in March, April, and July of 2009 is also not evidence of a retaliatory motive. Macon cannot rely on a three month time period and ignore the other fifteen months in the same time frame. In the absence of evidence of an improper motive, Macon has not met his burden of showing UPS's reason for termination was a pretext for retaliation.

## IV.    Conclusion

**IT IS THEREFORE ORDERED BY THE COURT** that UPS's Motion for Summary Judgment (Doc. 59) is GRANTED.

**IT IS SO ORDERED.**

Dated: <u>March 6, 2012</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[52]*Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004).

[53]*Young v. Dillon Cos. Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

19